Peggy Hunt (Utah State Bar No. 6060)
Chris Martinez (Utah State Bar No. 11152)
Jeffrey M. Armington (Utah State Bar No. 14050)
**DORSEY & WHITNEY LLP**
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email: hunt.peggy@dorsey.com
          martinez.chris@dorsey.com
          armington.jeff@dorsey.com

*Attorneys for Court-Appointed Receiver R. Wayne Klein*

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| R. WAYNE KLEIN, as Receiver,<br><br>            Plaintiff,<br>     v.<br><br>TERRY STALLMAN, a Nevada resident, and JOHN DOES 1 through 5,<br><br>            Defendants. | **COMPLAINT**<br><br>**(Ancillary to Case No. 2:12-cv-00591)**<br><br>Civil No. _____ |

R. Wayne Klein, the Court-Appointed Receiver (the "Receiver" or "Plaintiff") of National Note of Utah, LC ("National Note"), its subsidiaries and affiliates (collectively, unless otherwise stated, National Note and all subsidiaries and affiliated entities are referred to herein as "NNU"), and the assets of Wayne LaMar Palmer ("Palmer"), in the case styled as *Securities and Exchange Commission v. National Note of Utah, LC et al.*, Case No. 2:12-cv-00591 (D. Utah) (Jenkins, J.) (the "SEC Civil Enforcement Case"), hereby files this Complaint against Terry Stallman ("Stallman") and John Does 1-5 ("Defendant Does") (collectively, "Defendants"), and states, alleges and avers as follows:

## STATEMENT OF THE CASE

1.  NNU was operated as an enterprise with all of the characteristics of a Ponzi scheme through which money was solicited from investors.[1] Upon information and belief, Stallman was an NNU investor who received monies from NNU, and the Receiver seeks to avoid the transfers and/or recover the value of the transfers from Defendants for the benefit of the receivership estate established in the SEC Civil Enforcement Case discussed in greater detail below. Additionally, the Receiver seeks a declaration that Defendant has no valid interest in real property of the Receivership Estate.

## PARTIES

2.  Pursuant to an Order Appointing Receiver and Staying Litigation entered on June 25, 2012 in the SEC Civil Enforcement Case (the "<u>Receivership Order</u>"),[2] Plaintiff is the duly-appointed Receiver for National Note and Palmer "together with any and all subsidiaries and affiliated entities of National Note and Palmer. . . ."[3]

3.  Upon information and belief, Stallman is a resident of or is domiciled in in the State of Nevada.

4.  Upon information and belief, Defendant John Does currently unknown parties who have received monies or property from NNU, or are persons to whom Stallman has transferred monies or property received from NNU.

---

[1] *See* SEC Civil Enforcement Case, Docket No. 1 (Complaint).

[2] SEC Civil Enforcement Case, Docket No. 9.

[3] *Id.* (Receivership Order, pp. 1-2).

## JURSIDICTION AND VENUE

5. Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. §1367.

6. The Court has personal jurisdiction over Defendant.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 754.

## FACTS

### The Ponzi Scheme

8. Since at least 1994 until the commencement of the SEC Civil Enforcement Case, NNU raised capital by soliciting investors to purchase promissory notes, which typically promised to pay interest at a rate of interest above market rates.

9. Upon information and belief, investors understood that they were investing in an enterprise that, among other things, bought and sold mortgage notes, underwrote and made loans, or bought and sold real estate assets through National Note, or one of many affiliated entities subject to the Receivership Order, all of which are referred to herein collectively as "NNU."

10. Typically, investment funds were deposited in a commingled bank account controlled by NNU. NNU would then transfer such investor funds to another bank account (the "Investor Account").

11. Monies on deposit in the Investor Account were commingled, and transfers to investors by NNU were made from the commingled funds on deposit in that Investor Account.

12. At all times relevant hereto, NNU was insolvent.

### Defendant's Investment and the Transfers

13. On or about 2004, Stallman commenced investing with NNU. A history of Stallman's investment(s) is attached hereto as Exhibit A.

14. Stallman paid NNU cash in the total amount of $99,433.07 on or about 2004, 2005, 2006, and 2009 (the "Principal Cash Investment").

15. As set forth on Exhibit A, NNU transferred a total of $110,146.09 in cash to Stallman (the "Total Transfers").

16. Of the Total Transfers, $10,713.02 is an amount that is over and above Stallman's Principal Cash Investment (the "False Profit Transfers") (collectively, the Total Transfers and the False Profit Transfers are the "Transfers").[4]

## National Note's Investment Scheme

17. National Note represented to investors that their investment in National Note would be secured by real property. National Note did not own real property sufficient to secure these investments. Accordingly, National Note devised a scheme pursuant to which National Note would purport to grant security to investors, when in truth, National Note would take investors' money and give them no security in return. National Note's scheme was as follows.

18. First, National Note would lend money to an affiliated entity (the "Affiliate"). The Affiliate would execute a promissory note, pursuant to which it agreed to repay the loan to National Note (the "Affiliate Note"). The Affiliate Note would then be secured by a Trust Deed executed by the Affiliate in favor of National Note (the "Affiliate Trust Deed").

19. National Note then solicited money from investors by promising that their investment would be secured by Assignments of Beneficial Interest in Trust Deed (the "ABIs"). The ABIs purported to assign National Note's "right, title and interest" in the Affiliate Trust Deed. National Note did not assign its interest in the Affiliate Note to the investors. The

---

[4] *See* Exh. A.

following diagram shows National Note's scheme:



20. The investors purportedly received an assignment of National Note's secured interest in real property. This secured interest gave National Note the right to foreclose on the underlying real property if the Affiliate defaulted on the Affiliate Note. If, however, the Affiliate never defaulted and the Affiliate Note was paid, the Affiliate Trust Deed was cancelled and the secured interest disappeared.

21. The Affiliate was not a party to any of the ABIs and there was no privity of contract between the Affiliate and the investors. Accordingly, there was no contract pursuant to which the Affiliate was obligated to pay the Affiliate Note payments to the investors instead of National Note. Moreover, the ABI did not assign National Note's rights under the Affiliate Note to the investors. Accordingly, the ABI did not give the Investor the right to demand payment under the Affiliate Note.

22. The end result of this scheme was that the investors received no security at all. If National Note breached its agreement with the investor, the investor had no foreclosure rights as

a result of the assignment of National Note's interest in the Affiliate Deed of Trust, because the Affiliate Deed of Trust was security for the Affiliate Note, not the agreement between National Note and the investors.

## Stallman Invests with National Note

23. A portion of Stallman's investment with National Note was documented in a Promissory Note, dated January 16, 2006 (the "Stallman Note").

24. Consistent with the financing scheme outlined above, the Stallman Note was not secured by a deed of trust. Instead, on January 4, 2008, National Note executed an Assignment of Beneficial Interest in Trust Deed in favor of Stallman (the "Stallman ABI"). The Stallman ABI purported to assign National Note's interest in a Trust Deed for real property in Malad, Idaho - specifically Lot 11 of the Elkhorn Ridge Estates ("Elkhorn Lot 11"). This Trust Deed was executed by Elkhorn Ridge, LLC in favor of National Note (the "NNU Lot 11 Trust Deed"). The NNU Lot 11 Trust Deed was security for a purported loan between National Note and Elkhorn Ridge, LLC (the "NNU Lot 11 Note"). National Note did not assign its beneficial interest in the NNU Lot 11 Note to Stallman. The following diagram illustrates the transactions:



6

26.     National Note did not execute a trust deed for Elkhorn Lot 11 in favor of Stallman.  Moreover, Elkhorn Ridge, LLC is not a party to the Stallman ABI.  Indeed, there is no privity of contract between Elkhorn Ridge, LLC and Stallman.  Finally, the Stallman ABI did not assign National Note's rights under the NNU Lot 11 Note to Stallman.  Accordingly, the Stallman ABI did not give Stallman the right to demand payment under the NNU Lot 11 Note.

27.     All that Stallman purported to receive through the Stallman ABI was an assignment of National Note's security interest in the NNU Lot 11 Trust Deed.  National Note's security interest merely gave National Note the right to foreclose on Elkhorn Lot 11 if Elkhorn Ridge, LLC defaulted on the NNU Lot 11 Note.  If, however, Elkhorn Ridge, LLC never defaulted and the NNU Lot 11 Note was paid, the NNU Lot 11 Trust Deed was cancelled and the secured interest disappeared, regardless of whether National Note honored the Stallman Note.

28.     Conversely, the Stallman ABI gave Stallman no right to foreclose on Elkhorn Lot 11, had National Note defaulted on the Stallman Note.  This is because the NNU Lot 11 Trust Deed did not secure the Stallman Note.  Accordingly, as a matter of law and fact, the Stallman ABI gave no security to Stallman.  The Stallman Note was nothing more than an unsecured note.

## The SEC Civil Case and the Receiver's Appointment

29.     On June 25, 2012, the SEC Civil Enforcement Case was filed, alleging that NNU is a Ponzi scheme, and seeking, among other things, orders (a) restraining and enjoining NNU and Palmer from continuing to violate federal securities laws, (b) freezing assets and prohibiting NNU from transferring, changing, wasting, dissipating, converting, concealing, or otherwise disposing of assets, (c) prohibiting NNU from destroying, mutilating, concealing, transferring, altering, or otherwise disposing of NNU's books and records, (d) imposing civil money penalties

against NNU and Palmer, and (e) requiring the disgorgement by NNU and Palmer of all ill-gotten gains received by them pursuant to the scheme.[5]

30. Also on June 25, 2012, as a result of the filing of the SEC Civil Enforcement Action, the Court entered a Temporary Restraining Order and Order to Show Cause against the defendants[6] and the Receivership Order appointing the Receiver.[7] Since that time, both National Note and Palmer have stipulated to a Preliminary Injunction Order that prohibits National Note and Palmer from committing any further acts in furtherance of the Ponzi scheme and that prohibits National Note and Palmer from withdrawing, transferring, selling, buying, pledging, encumbering, assigning, dissipating, concealing, or otherwise disposing of any of their assets.[8]

31. On or about May 21, 2013, the Court entered an Order authorizing the Receiver to commence legal proceedings for the benefit of and on behalf of the receivership estate.[9]

## FIRST CLAIM FOR RELIEF
*(Avoidance of Fraudulent Transfers Under Utah Code Ann. §§ 25-6-5(1)(a) and 25-6-8)*

32. The Receiver re-alleges and incorporates herein by reference each of the preceding allegations as if set forth completely herein.

33. NNU was engaged in an enterprise with all of the characteristics of a Ponzi scheme.

34. NNU made the Transfers to Stallman in furtherance of the Ponzi scheme.

---

[5] SEC Civil Enforcement Case, Docket No. 1 (Complaint).

[6] *Id.*, Docket No. 7.

[7] *Id.*, Docket No. 9.

[8] *Id.*, Docket Nos. 45 and 46.

[9] *Id.,* Docket No. 315.

35. At all relevant times hereto, NNU had at least one creditor.

36. The Transfers were made and any obligations to Stallman were incurred with actual intent to hinder, delay or defraud a creditor of NNU.

37. Pursuant to Utah Code Ann. §§ 25-6-5(1)(a) and 25-6-8, the Receiver may avoid and recover the Transfers to Stallman, or in the event such Transfers were transferred, from the Defendant Does.

38. Alternatively, to the extent that Stallman took in good faith and for a reasonably equivalent value, the Receiver may avoid and recover the False Profit Transfers from Stallman, or in the event such False Profit Transfers were transferred, from the Defendant Does.

## SECOND CLAIM FOR RELIEF
*(Avoidance of Fraudulent Transfers Under Utah Code Ann. §§ 25-6-5(1)(b) and 25-6-8)*

39. The Receiver re-alleges and incorporates herein by reference each of the preceding allegations as if set forth completely herein.

40. NNU was engaged in an enterprise that has all of the characteristics of a Ponzi scheme.

41. NNU made the Transfers to Stallman in furtherance of the Ponzi scheme.

42. At all relevant times hereto, NNU had at least one creditor.

43. The Transfers were made or the obligations to Stallman were incurred by NNU without receiving a reasonably equivalent value in exchange for the Transfers or obligations.

44. At the time the Transfers were made, NNU (a) was engaged or was about to be engaged in a business or transaction for which the remaining assets of NNU were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably

should have believed that it would incur, debts beyond its ability to pay as such debts became due.

45. Pursuant to Utah Code Ann. §§ 25-6-5(1)(b) and 25-6-8, the Receiver may avoid and recover the Transfers to Stallman, or in the event such Transfers were transferred, from the Defendant Does.

46. Alternatively, to the extent that Stallman took in good faith and for a reasonably equivalent value, the Receiver may avoid and recover the False Profit Transfers from Stallman, or in the event such Transfers were transferred, from the Defendant Does.

### THIRD CLAIM FOR RELIEF
*(Avoidance of Fraudulent Transfers Under Utah Code Ann. §§ 25-6-6(1) and 25-6-8)*

47. The Receiver re-alleges and incorporates herein by reference each of the preceding allegations as if set forth completely herein.

48. NNU was engaged in a Ponzi scheme.

49. NNU made the Transfers to Stallman in furtherance of the Ponzi scheme.

50. NNU had at least one creditor at the time that the Transfers were made or the obligation to Stallman was incurred.

51. The Transfers were made or the obligation to Stallman was incurred by NNU without NNU receiving a reasonably equivalent value in exchange for the Transfer or obligation.

52. NNU was insolvent at the time the Transfers were made or the obligation was incurred, or became insolvent as a result of the Transfers or the obligation incurred.

53. Pursuant to Utah Code Ann. §§ 25-6-6(1) and 25-6-8, the Receiver may avoid and recover the Transfers to Stallman, or in the event such Transfers were transferred, from the

Defendant Does.

54. Alternatively, to the extent that Stallman took in good faith and for a reasonably equivalent value, the Receiver may avoid and recover the False Profit Transfers from Stallman, or in the event such Transfers were transferred, from the Defendant Does.

## FOURTH CLAIM FOR RELIEF
*(Constructive Trust)*

55. The Receiver re-alleges and incorporates herein by reference each of the preceding allegations as if set forth completely herein.

56. The Transfers to Defendants were comprised of property of NNU and were made by NNU in furtherance of the Ponzi scheme.

57. Allowing Defendants to retain the Transfers would unjustly enrich Defendants and would be inequitable.

58. The Transfers can be traced to wrongful behavior.

59. An injustice would result if Defendants was allowed to keep the Transfers.

60. A constructive trust for the benefit of the receivership estate must be imposed for the benefit of the receivership estate in the amount of the Transfers made by NNU to Defendants, or in the alternative if Stallman acted in good faith, for the False Profit Transfers.

## FIFTH CLAIM FOR RELIEF
*(Unjust Enrichment)*

61. The Receiver re-alleges and incorporates herein by reference each of the preceding allegations as if set forth completely herein.

62. The Transfers to Defendants were comprised of property of NNU and were made by NNU in furtherance of the Ponzi scheme.

63. The Transfers conferred a benefit upon Defendants.

64. The Defendants knowingly benefitted from the Transfers.

65. Allowing Defendants to retain the Transfers would unjustly enrich Defendants and would be inequitable.

66. Absent return of the Transfers, the receivership estate will be damaged by Defendants' unjust enrichment and may have no adequate remedy at law.

67. Defendants must disgorge the amount of the Transfers, or if Stallman acted in good faith, the False Profit Transfers, for the benefit of the receivership estate.

### SIXTH CLAIM FOR RELIEF
*(Disgorgement)*

68. The Receiver re-alleges and incorporates herein by reference each of the preceding allegations as if set forth completely herein.

69. The Transfers were made as part of and in furtherance of a Ponzi scheme.

70. The Transfers were ill-gotten by Defendants.

71. Defendants have no claim to the Transfers made by NNU, or derivatively, from NNU's investors.

72. All Transfers made to Defendants, or if Stallman acted in good faith, the False Profit Transfers, should be disgorged to the Receiver for the benefit of the receivership estate.

### SEVENTH CLAIM FOR RELIEF
*(Declaratory Judgment)*

73. The Receiver incorporates by reference herein all previous paragraphs of this Complaint.

74. An actual controversy has arisen between the Receiver and Stallman regarding the enforceability of the Stallman ABI.

75. The Receiver is entitled to a declaratory judgment that:

    a. The Stallman ABI is invalid and never gave Stallman any security for his investment with National Note.

76. A judicial declaration is necessary and appropriate at this time under the circumstances in order that the respective rights and duties of the parties may be determined.

## PRAYER FOR RELIEF

WHEREFORE, the Receiver prays for Judgment against Defendants as follows:

A. Pursuant to the Receiver's First Claim for Relief, judgment against Defendants avoiding the Transfers under Utah Code Ann. §§ 25-6-5(a)(1) and 25-6-8, and permitting Plaintiff's recovery of the value of the Transfers in the total amount of $110,146.09, or alternatively, the amount of the False Profit Transfers, in the total amount of $10,713.02.

B. Pursuant to the Receiver's Second Claim for Relief, judgment against Defendants avoiding the Transfers under Utah Code Ann. §§ 25-6-5(a)(2) and 25-6-8, and permitting Plaintiff's recovery of the value of the Transfers in the total amount of $110,146.09, or alternatively, the amount of the False Profit Transfers, in the total amount of $10,713.02.

C. Pursuant to the Receiver's Third Claim for Relief, judgment against Defendants avoiding the Transfers under Utah Code Ann. §§ 25-6-6(1) and 25-6-8, and permitting Plaintiff's recovery of the value of the Transfers in the total amount of $110,146.09, or alternatively, the amount of the False Profit Transfers, in the total amount of $10,713.02.

D. Pursuant to the Receiver's Fourth Claim for Relief, judgment against Defendants

imposing a constructive trust for the benefit of the receivership estate on any and all Transfers, or alternatively, all False Profit Transfers.

E. Pursuant to the Receiver's Fifth Claim for Relief, judgment against Defendants for unjust enrichment, and requiring Defendant to disgorge the Transfers in the total amount of $110,146.09, or alternatively, the amount of the False Profit Transfers, in the total amount of $10,713.02.

F. Pursuant to the Receiver's Sixth Claim for Relief, entry of an Order requiring Defendants to disgorge the Transfers in the total amount of $110,146.09, or alternatively, the amount of the False Profit Transfers, in the total amount of $10,713.02.

G. Pursuant to the Receiver's Seventh Claim for Relief, entry of an Order and Judgment declaring that:

    a. The Stallman ABI is invalid and never gave Stallman any security for his loan to National Note.

H. Judgment for pre-judgment interest, costs, and fees, including reasonable attorney's fees, as may be allowed by law.

I. For such other and further relief as the Court deems just and proper.

DATED this 6th day of June, 2013.

                              **DORSEY & WHITNEY LLP**

                              */s/ Peggy Hunt*
                              Peggy Hunt
                              Chris Martinez
                              Jeffrey M. Armington
                              *Attorneys for Receiver*